1  BRIGGS LAW CORPORATION [FILE: 1190.05]
   Cory J. Briggs (State Bar no. 176284)
2  Mekaela M. Gladden (State Bar no. 253673)
   99 East "C" Street, Suite 111
3  Upland, CA 91786
   Telephone: 909-949-7115
4  Facsimile: 909-949-7121

5  Attorneys for Plaintiffs La Cuna de Aztlan Sacred Sites
        Protection Circle Advisory Committee, CAlifornians for
6       Renewable Energy, Alfredo Acosta Figueroa, Phillip Smith,
        Patricia Figueroa, Ronald Van Fleet, Catherine Ohrin-Greipp.
7       Rudy Martinez Macias, and Gilbert Leivas

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10
11  LA CUNA DE AZTLAN SACRED SITES )
    PROTECTION    CIRCLE    ADVISORY )   CASE NO.2:11-CV-00400-DMG-DTB
12  COMMITTEE *et al.*,                       )
                                        )   **PLAINTIFFS' OPENING BRIEF IN**
                                        )   **SUPPORT   OF   MOTION   FOR**
13          Plaintiffs,                  )   **SUMMARY JUDGMENT**
                                        )
14       vs.                             )
                                        )   Hearing Date:      August 31, 2012
15  UNITED  STATES  DEPARTMENT  OF )        Hearing Time:      9:30 a.m.
    THE INTERIOR *et al.*,                   )   Courtroom:         7
16                                      )   Judge:             Hon. Dolly M. Gee
            Defendants.                  )
17
18
19
20
21
22       Plaintiffs respectfully submit this opening brief in support of their motion for
23  summary judgment.
24
25
26
27
28

# **Table of Contents**

I.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.   Argument and Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     A.   Plaintiffs Have Standing to Maintain This Action . . . . . . . . . . . . . . . . 4

          1.   Plaintiffs Satisfy the Statutory Requirements for Standing under the Administrative Procedure Act . . . . . . . . . . . . . . . . . . . 4

              a.   There Has Been Final Agency Action . . . . . . . . . . . . . . . . 5

              b.   Plaintiffs Are within the Zone of Interests of the Laws They Seek to Enforce . . . . . . . . . . . . . . . . . . . . . . . 5

     B.   Defendants Violated the National Environmental Policy Act . . . . . . . . 8

          1.   Defendants Defined the Ivanpah Project's Purpose and Need Too Narrowly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          2.   Defendants Did Not Prepare a Programmatic Environmental Impact Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     C.   Defendants Violated the Federal Land Policy and Management Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     D.   Defendants Violated the National Historic Preservation Act . . . . . . . . 16

     E.   Defendants Violated the Religious Freedom Restoration Act . . . . . . . 17

     F.   Defendants Violated the Energy Policy Act of 2005 . . . . . . . . . . . . . 21

V.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## **Table of Authorities**

<u>Judicial Authorities</u>

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Anacostia Watershed Soc. v. Babbitt*, 871 F. Supp. 475 (D.D.C. 1994) . . . . . . . . . . 5

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . 1, 2

*Carey v. Population Services Int'l,* 431 U.S. 678 (1977) . . . . . . . . . . . . . . . . . . . . . 4

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

*Citizens for Better Forestry v. U.S. Dep't of Agriculture*,

    341 F.3d 961 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*City of Carmel-by-the-Sea v. U.S. Dept. Of Trans.*, 123 F.3d 1142 (9th Cir. 1997) . . 9

*City of Tenakee Springs v. Clogh*, 915 F.3d 1308 (9th Cir. 1990) . . . . . . . . . . . . . 13

*Clark v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Environmental Defense Fund v. Adams*, 434 F. Supp. 403 (D.D.C. 1977) . . . . . . . . 12

*Freeman v. Arpaio*, 125 F. 3d 732 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Gartrell v. Ashcroft*, 191 F. Supp. 2d 23 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . 20

*Gonzalez v. O Centro Espirita Beneficente Uniao Do Vegetal*,

    546 U.S. 418 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Laub v. United States Dep't of the Interior*, 342 F.3d 1080 (9th Cir. 2003) . . . . . . . . 5

*Leonard v. Clark*, 12 F.3d 885 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F. 3d 800 (9th Cir. 1999) . . . . . 6

*National Credit Union Admin. v. First National Bank and Trust Co.*,

    522 U.S. 479 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*National Parks & Conservation Assn. v. Bureau of Land Mgmt.*,

    606 F. 3d 1058, 1070 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Native Ecosystems Council v. U.S. Forest Ser.*, 428 F. 3d 1233 (9th Cir. 2005) . . . . 9

*Navajo Nation v. U.S. Forest Serv*, 535 F.3d 1058 (9th Cir. 2008) . . . . . . . 17, 18, 19

*Oregon Natural Resources Council Fund v. Brong*,

1  492 F.3d 1120 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

2  *Riverbend Farms v. Madigan*, 958 F. 2d 1479 (9th Cir. 1992) . . . . . . . . . . . . . . . . 21

3  *Roberston v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) . . . . . . . . . . . . 5

4  *San Diego Air Sports Ctr. V. Federal Aviation Admin.*,

5       887 F. 2d 966 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

6  *Snoqualmie Indian Tribe v. Federal Energy Regulatory Commission*,

7       545 F.3d 1207 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

8  *Southern Calif. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) . . . . . . . 2

9

10  <u>Legislative Authorities</u>

11  5 U.S.C. § 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

12  5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

13  42 U.S.C. § 16513 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

14  42 U.S.C. § 16515 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

15  42 U.S.C. § 16516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

16  42 U.S.C. § 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

17  42 U.S.C. § 4331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18  42 U.S.C. § 4332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 12

19  43 U.S.C. § 1701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

20  43 U.S.C. § 1712 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

21  43 U.S.C. § 1732 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14

22  43 U.S.C. § 1781 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 14

23  FED. R. CIV. PROC. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

24  Pub. L. No. 111-5, 123 Stat. 115 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 22, 24

25

26  <u>Administrative Authorities</u>

27  36 C.F.R. § 800.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28  36 C.F.R. § 800.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

36 C.F.R. § 800.1(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

36 C.F.R. § 800.1(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

36 C.F.R. § 800.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

36 C.F.R. § 800.2(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

36 C.F.R. § 800.2(a)(4)(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

36 C.F.R. § 800.3(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

36 C.F.R. § 800.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

36 C.F.R. § 800.4(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

40 C.F.R. § 1500.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

40 C.F.R. § 1502.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

40 C.F.R. § 1502.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

40 C.F.R. § 1502.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

72 Fed. Reg. 60116 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

74 Fed. Reg. 63544 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 23

# I. Introduction

In 2010, Native Americans from the Fort Mojave and Chemehuevi Tribes could be seen standing at the Alter of Metamorphosis Hill, engaging in a religious ceremony–chanting, dancing, praying.  They could be found traversing the desert along the Salt Song Trails, lined with artifacts telling the story of their past and connecting sacred sites, engaging in a Spirit Run to connect with their ancestors.  Thing are different today.  No longer do these rituals take place because miles and miles and acres and acres of fences, mirrors, and power towers stand in the way, and security guards stand ready to haul away "trespassers" for prosecution.

At the center of this controversy is a massive solar-energy facility approved for development on land long considered sacred by Plaintiffs and their ancestors, on pristine desert land set aside by the federal government for special protection.  That view of Clark Mountain will now be impeded by industrial development.  Portions of the Salt Song Trails will vanish, as will the ceremonies that take place along them.  Nobody disputes that weaning the country from its dependence on fossil fuel is a noble cause; Plaintiffs applaud it.  The problem is a matter of siting.  Defendants are pursuing the right idea in the wrong location and without following the proper procedures.  The past, present, and future can co-exist.  The future does not have to wipe out a way of life that, until recently, had been going on for thousands of years.

# II.  Standard of Review

Summary judgment is appropriate when the moving party demonstrates the lack of any genuine issue of material fact and entitlement to judgment as a matter of law.  *See* FED. R. CIV. PROC. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those that, under the governing substantive law, could affect the outcome of the litigation; factual disputes that are irrelevant or unnecessary are to be ignored.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997) (citing *Anderson*).  A dispute over the evidence is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, supra*, 477 U.S. at 248.

The party moving for summary judgment always bears the initial burden of establishing there is no genuine issue of material fact. *Celotex, supra*, 477 U.S. at 323. The moving party may meet this burden in two ways: *either* by presenting evidence that negates an essential element of the non-moving party's case, *or* by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-323. If the moving party cannot meet this burden, then summary judgment will be denied and the Court need not consider other evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970) (finding non-moving party not required to come forward with opposing affidavits where moving party did not meet its initial burden).

To avoid summary judgment, however, the non-moving party "must direct [the Court's] attention to specific, triable facts." *Southern Calif. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). Indeed, the moving party is entitled to summary judgment if it demonstrates that the non-moving party lacks sufficient evidence to carry its burden of proof at trial. *Celotex Corp., supra*, 477 U.S. at 325.

Overall, Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp., supra*, 477 U.S. at 322.


### III.  BACKGROUND

Generally speaking, this lawsuit challenges Federal Defendants' actions in connection with a major solar-electricity generation project taking place on federal public land: the *Ivanpah Solar Electric Generating System Project and Associated Amendment to the California Desert Conservation Plan* ("Ivanpah Project," "Project," or "ISEGS"). Pls.' Sep. Stmt. of Facts ("SSF") 58. The Project is designed to generate

370 megawatts of electricity on approximately 3,472 acres of land.  SSF 59.  The Project is a development of three solar concentrating thermal power plants using fields of heliostats (elevated mirrors guided by a tracking system) to focus solar energy on boilers located in centralized towers.  SSF 60.

The Ivanpah Project will be built in San Bernardino County in a region labeled by Congress as the California Desert Conservation Area ("CDCA"). SSF 61.  The region bears this name because it "contains historical, scenic, archeological, environmental, biological, cultural, scientific, educational, recreational, and economic resources that are uniquely located adjacent to an area of large population."  43 U.S.C. § 1781(a)(1) (describing Congressional finding for establishment of CDCA).

In November 2009, a draft Environmental Impact Statement ("EIS") and draft CDCA Plan Amendment was prepared for the Ivanpah Project. SSF 62. In April 2010, a supplemental draft EIS was prepared.  SSF 63.  In July 2010, a final EIS was prepared.  SSF 64.  By October 2010, the Department of the Interior and Bureau of Land Management (collectively, "BLM") issued a Record of Decision ("ROD"). SSF 65. The ROD covered two decisions: amending the CDCA Plan to include the Project as an approved power-generation site; and granting four Right-of-Way ("ROW") approvals for the Mitigated Ivanpah 3 Alternatives.  SSF 66.  In October 2010, the Department of Energy ("DOE") adopted the Final EIS. SSF 67.  In April 2011, the DOE issued a ROD.  SSF 68.  Plaintiffs commenced this action in January 2011.  SSF 69.

Plaintiffs seek summary judgment on claims arising under the Religious Freedom Restoration Act ("RFRA"), the National Environmental Policy Act ("NEPA"), the Federal Land Policy Management Act ("FLPMA"), the National Historic Preservation Act ("NHPA"), and the Energy Policy Act of 2005 ("EPAct") and American Recovery and Reinvestment Act of 2009 ("ARRA").  The RFRA claim is actionable directly, and the other claims are actionable under the Administrative Procedure Act ("APA").  Since this section deals only with background, the specific wrongdoing by Federal Defendants under the aforementioned laws will be discussed in the corresponding sections below.

## IV.  ARGUMENT AND ANALYSIS

### A.  **Plaintiffs Have Standing to Maintain This Action**

Plaintiffs have standing to assert their claims against Defendants in this action. To advance to the merits, Plaintiff must meet the general requirements for Article III standing, the requirements for associational standing, and the requirements for statutory standing under the APA for the APA-based claims.

For the sake of brevity, Plaintiffs will not be providing a comprehensive standing analysis in this brief.  Plaintiffs' standing was challenged by motions to dismiss, and the Court concluded that Plaintiffs had standing with the single exception of Plaintiff LA Cuna, who needed to provide additional allegations to show associational standing.  The "general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs have standing, it need not decide the standing of others."  *Leonard v. Clark,* 12 F.3d 885, 888 (9th Cir. 1994) (*citing Carey v. Population Services Int'l*, 431 U.S. 678, 682 (1977)).  Nonetheless, this motion is accompanied by declarations establishing the associational standing of Plaintiff La Cuna. These declarations and the administrative record prove La Cuna's associational standing.

The only other standing-related issue not decided in Plaintiffs' favor in the earlier motions is standing for the APA-based claims.  Plaintiffs will discuss their APA standing now.

### 1.  **Plaintiffs Satisfy the Statutory Requirements for Standing under the Administrative Procedure Act**

To meet the requirement for standing under the APA, Plaintiffs must establish (*i*) that there has been final agency action adversely affecting them; and (*ii*) that consequently they have suffered legal wrong or their injury falls within the zone of interests of the statutory provision that Federal Defendants are claimed to have violated. *See Citizens for Better Forestry v. U.S. Dep't of Agriculture*, 341 F.3d 961, 976 (9th Cir. 2003).

### a.  **There Has Been Final Agency Action**

An approved ROD is a "final agency action."  *See Anacostia Watershed Soc. v. Babbitt*, 871 F. Supp. 475, 480 (D.D.C. 1994) (finding that record of decision demonstrates action was final agency action).  Where an agency has committed to a course of action, a challenge is ripe.  *See Laub v. United States Dep't of the Interior*, 342 F.3d 1080, 1091 (9th Cir. 2003) (finding challenge ripe where "the ROD pre-determines the future through the selection of a long-term plan (to the exclusion of others which will not be among the available options at the implementation phase)").  BLM issued a ROD in October 2010.  SSF 65. DOE issued its own record of decision several months later.  SSF 68.  Both decisions are final.

> **b.**   **Plaintiffs Are within the Zone of Interests of the Laws They Seek to Enforce**

Plaintiffs are within the zone of interests of the laws they seek to enforce.  The Supreme Court has determined that "there need be no indication of congressional purpose to benefit the would-be plaintiff."  *National Credit Union Admin. v. First National Bank & Trust Co.*, 522 U.S. 479, 491 (1988).  The zone-of-interests test "is not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987).

<u>NEPA</u>: In *Citizens for Better Forestry*, the Court of Appeals concluded that an environmental group suing under NEPA satisfied this element because "NEPA's purpose is to protect the environment" and because the group "was plainly trying to protect the environment." *See Citizens for Better Forestry, supra*, 341 F.3d at 976.  On that basis, it was concluded that the group's suit "thus lies well within NEPA's zone of interests." *Id.*  NEPA also aims to promote environmentally sensitive governmental decision-making. *See Roberston v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989) (acknowledging NEPA's informational goal and role in decision-making process).  As Plaintiffs' supporting declarations and the administrative record show, these are the very ends that Plaintiffs aim to achieve with their NEPA claims.

1    <u>FLPMA</u>: FLPMA requires the federal government to "take any action necessary

2    to prevent unnecessary or undue degradation of land." 43 U.S.C. § 1732(b). Under the

3    CDCA Plan, the federal government is required "to provide for the immediate and future

4    protection and administration of the public lands in the California desert within the

5    framework of a program of multiple use and sustained yield, and the maintenance of the

6    environmental quality." *Id.*, § 1781(b). The supporting declarations and administrative

7    record confirm that Plaintiffs are focused on preserving the environmental quality of

8    public lands.

9    <u>NHPA</u>: The NHPA has been characterized as a "stop, look and listen" provision.

10   *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F. 3d 800, 805 (9th Cir. 1999).

11   NHPA regulations require federal agencies to provide interested members of the public

12   with a reasonable opportunity to participate in the decision-making process. 36 C.F.R.

13   §§ 800.1, 800.2. The regulations also require agencies to affirmatively seek information

14   from consulting parties and other individuals and organizations with knowledge of or

15   concerns over historic properties. *Id.*, § 800.4(a)(3). Plaintiffs did not receive an

16   adequate opportunity, are suing because of inadequate consultations, and thus fall with

17   the NHPA's zone of interests. The declarations and administrative record confirm their

18   interest in the federal land being destroyed by the Ivanpah Project.

19   <u>EPAct and ARRA</u>: Plaintiffs are also within EPAct's and ARRA's interest zones.

20   EPAct's Title XVII, where the statute at the heart of Plaintiffs' claim is codified, was

21   intended "to encourage commercial use in the United States of new or significantly

22   improved energy-related technologies and to achieve substantial ***environmental***

23   ***benefits***." 74 Fed. Reg. 63544 (emphasis added). Title XVII also includes the

24   prohibition against Section 1703 and Section 1705 loan guarantees in the absence of final

25   DOE regulations, the obvious purpose of which is ensuring that guarantees are given for

26   projects that meet EPAct's goals. The Ivanpah Project's environmental benefits--or

27   more accurately, the lack thereof--are part of what motivated Plaintiffs to sue.

28

ARRA's purpose was to "preserve and create jobs and promote economic recovery," "**assist those most impacted by the recession**," "provide investments needed to increase economic efficiency by spurring technological advances in science and health," "invest in transportation, **environmental protection**, and other infrastructure that will provide long-term economic benefits," and "stabilize State and local governmental budgets." Pub. L. No. 111-5, 123 Stat. 115, § 3(a) (emphasis added). At the same time, ARRA ordered the Executive Branch to "manage and expend the funds made available in this Act so as to achieve the purposes specified . . . including commencing expenditures and activities as quickly as possible **consistent with prudent management**." *Id.*, § 3(b) (emphasis added). Environmental protection, jobs for the needy, and prudent management of federal resources are key concerns of Plaintiffs.

Plaintiff CARE advocates for the creation of jobs, especially to assist those most impacted by recession (including Native Americans). SSF 54. CARE advocates for environmental protection. SSF 55. CARE (just like the other Plaintiffs) is not opposed to ARRA or the Section 1705 loan-guarantee program; instead, CARE believes the way it was carried out did not achieve ARRA's goals. SSF 52-57. Through the adoption of final vetting regulations for the Section 1705 program, CARE (and surely other members of the public) would have been able to provide DOE with suggestions for identifying renewable-energy projects that would substantially achieve ARRA's goals of environmental protection and more jobs for those most in need of them.

Altogether, Plaintiffs are within the zone of interests of the laws they seek to enforce under the APA.[1]

\*\*\*

As the foregoing discussion reveals, Plaintiffs have the constitutional and statutory standing necessary to maintain this challenge.

---

[1] Plaintiffs' RFRA claim does not arise under the APA, which is why it is not discussed here.

**B.**   **Defendants Violated the National Environmental Policy Act**

NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). In enacting NEPA, Congress recognized the "profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man." 42 U.S.C. § 4331(a).  In order to carry out the policy, the federal government must use all practicable means to, among other things, "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations," "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings,"and "preserve important historic, cultural, and natural aspects of our national heritage, and maintain wherever possible, an environment which supports diversity and variety of individual choice." *Id.*, § 4331(b)(1), (2) & (4).

NEPA requires an EIS for "major federal actions significantly affecting the quality of the environment." 42 U.S.C. § 4332(2)(C).  An EIS must provide a "full and fair discussion of significant environmental impacts" and is to "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

Federal Defendants violated NEPA in two distinct ways.  Their view of the Ivanpah Project's purpose and need was too narrow, thereby preventing them from considering a reasonable range of alternatives to the Project; and they failed to prepare a programmatic EIS for all the related solar-electricity projects taking place in the CDCA around the same time, including Ivanpah.  Each violation is discussed below.

1.  **Defendants Defined the Ivanpah Project's Purpose and Need Too Narrowly**

Defendants violated NEPA by defining the Ivanpah Project's purpose and need in unreasonably narrow terms, which also prevented consideration of a reasonable range of alternatives to the Project. Every EIS must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. "Agencies enjoy 'considerable discretion' to define the purpose and need of a project." *National Parks & Conservation Assn. v. Bureau of Land Mgmt.*, 606 F. 3d 1058, 1070 (9th Cir. 2010) ("*NPCA*"). However, an agency "cannot define its objectives in unreasonably narrow terms." *City of Carmel-by-the-Sea v. U.S. Dept. of Trans.*, 123 F.3d 1142 (9th Cir. 1997). The statement of purpose and alternatives are closely linked since "the stated goal of a project necessarily dictates the range of 'reasonable' alternatives." *Id*.

In this connection, NEPA requires that an EIS contain a discussion of the "alternatives to the proposed action." 42 U.S.C. §§ 4332(2)(C)(iii) & (E). The discussion of alternatives is at "the heart" of the NEPA process and is intended to provide a "clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. An agency must look at all reasonable alternatives.[2] *Native Ecosystems Council v. U.S. Forest Serv*., 428 F.3d 1233 (9th Cir. 2005).

*NPCA* controls. There BLM described the project's purpose and need as follows:

> The primary purpose of the Project is to develop a new Class III nonhazardous municipal solid waste landfill to meet the projected long-term demand for environmentally sound landfill capacity in Southern California; provide a long-term income source from the development of a nonhazardous municipal solid waste landfill; find an economically viable use for the existing byproducts at the Kaiser Eagle Mountain Mine site, including use of existing aggregate and overburden; and

---

[2] Plaintiff CARE raised the issue that an adequate range of feasible alternatives was not considered and that the range of alternatives considered was unreasonable because it failed to consider a "distributed generation" alternative. SSF 74. Others raised the issue that the range of alternatives remained too narrow because of a faulty purpose and need description. *See, e.g.*, SSF 75 (Center for Biological Diversity commenting that "BLM is still relying on faulty Purpose and Need description that unnecessarily narrows the range of alternatives").

1      provide long-term land use and development goals and
2      guidance for Townsite.

3   *NPCA, supra*, 606 F. 3d at 1070. The majority of the purposes and goals were in

4   response to the applicant's goals, not those of BLM. *Id.* The Ninth Circuit determined

5   that its task was to "determine whether the BLM's purpose and need statement properly

6   states the BLM's purpose and need, against the background of a private need, in a

7   manner broad enough to allow consideration of a reasonable range of alternatives." *Id.*

8   at 1071. In applying this standard, the Ninth Circuit determined that the purpose and

9   need statement included only one valid BLM goal (meeting long-term landfill demand)

10  and three private objectives, ultimately ruling that "[s]uch a narrowly drawn statement

11  necessarily and unreasonably constrains the possible range of alternatives." *Id.* at 1072.

12  BLM considered only six alternatives in detail due to its unduly narrow statement, and

13  all of them (except the No Action alternative) resulted in a landfill development of some

14  sort and required some portion of the land exchange to occur. *Id.* Altogether, the Ninth

15  Circuit found that, as a result of the unreasonably narrow purpose and need statement,

16  BLM ***necessarily*** considered an unreasonably narrow range of alternatives and upheld

17  the district court's grant of summary judgment on both the "purpose and need" and

18  "reasonable range of alternatives" claims under NEPA. *Id.*

19      The statement of purpose and need for the Ivanpah Project is just as bad as--in

20  fact, its even worse than--the one struck down in *NPCA*. In the final EIS here, BLM's

21  purpose and need is described in this way:

22      BLM's purpose and need for the ISEGS project is to ***respond
        to the applicant's application*** under Title V of the FLPMA
23      (43 USC 1761) for a ROW grant to construct, operate,
        maintain, and decommission a concentrated solar electric
24      generation plan on public land along with associated
        infrastructure in compliance with FLPMA, BLM regulations
25      and other applicable laws. * * * The BLM will determine
        and disclose the environmental impacts of the ISEGS proposal
26      and decide whether granting the requested ROW is in the
        public interest. The BLM has determined that the proposed
27      solar project and associated ROW would require an
        amendment to the CDCA Plan. The BLM will also consider
28      the amendment of the CDCA Plan to identify the ISEGS site.

1   SSF 70.  The defect in this statement is obvious: it fails to mention even one ***public***

2   purpose or need!  In *NPCA*, BLM's statement at least recognized one public goal:

3   namely, meeting long-term landfill demand.  *NCPA, supra*, 606 F.3d at 1071.

4        The Environmental Protection Agency ("EPA") warned Federal Defendants and

5   framed the issue well in its comments on the Project.  EPA explained that "the *purpose*

6   of the proposed action is typically the specific objectives of the activity, while the *need*

7   for the proposed action may be to eliminate a broader underlying problem or take

8   advantage of an opportunity."  SSF 72.   In April 2010, it appeared that Federal

9   Defendants were at least trying to heed EPA's advice.  At that time, the purpose of the

10  proposed action was to "approve, approve with modifications, or disapprove ROW

11  applications filed by Solar Partners I, LLC; Solar Partners II, LLC; Solar Partners IV,

12  LLC; and Solar Partners VII, LLC (applicant) . . . to develop the Ivanpah Solar Electric

13  Generation System (ISEGS) project"; and the need was described as facilitating the

14  development of renewable energy sources and meeting federal and state policy goals of

15  generating renewable energy on public lands.[3]  SSF 73. But when Federal Defendants

16  went to finalize the EIS three months later, the purpose and need statement was restricted

17  to exclude public need and purpose.  The purpose and need ended up being limited to

18  responding to the developer's application and not to any public purpose or need.  SSF

19  70.

20        Even though *NPCA* was decided months before final action was taken on the

21  Ivanpah Project, Federal Defendants--and BLM in particular--failed to learn the lesson

22  of that decision.  By going in the opposite direction here and having an unreasonably

23  narrow statement of purpose and need, Federal Defendants violated NEPA in that regard

28  [3] Even this formulation of purpose and need was illegal under *NPCA* because it had no more public purpose than the one struck down in that case.  Plaintiffs' only point is that Federal Defendants appeared to be moving in the right direction (if only momentarily).

1   and necessarily failed to look at a reasonable range of alternatives.[4]  NEPA and the Ninth
2   Circuit condone neither.

3   **2.   Defendants Did Not Prepare a Programmatic Environmental**
4   **Impact Statement**

5       Federal Defendants violated NEPA in another way.  They did so by failing to
6   prepare a programmatic EIS for the other solar-electricity projects taking place in the
7   CDCA around the same time.

8       NEPA requires that for "every recommendation or report on proposals for . . .
9   major Federal actions significantly affecting the quality of the human environment," the
10  responsible official include a detailed statement on the environmental impact of the
11  proposed action, any adverse environmental effects which cannot be avoided,
12  alternatives to the proposed action, the relationship between the local short-term uses and
13  maintenance of long-term productivity, and any irreversible and irretrievable
14  commitments of resources which would be involved in the proposed action should it be
15  implemented.  42 U.S.C. § 4332(2)(C). The Supreme Court has ruled that "when several
16  proposals for [related] actions that will have cumulative or synergistic environment
17  impact upon a ***region*** are pending concurrently before an agency, their environmental
18  consequences must be ***considered together***.  Only through comprehensive consideration
19  of pending propsals can the agency evaluate different courses of action." *Kleppe v.*
20  *Sierra Club*, 427 U.S. 390, 410 (1976) (emphasis added).

21      *Kleppe* has been interpreted to require a two-part test for determining whether to
22  prepare a single environmental document for a large-scale plan.  First, the "document
23  must contain a 'proposal' [--] that is, a goal toward which the responsible federal official
24  intends to direct his energies." *Environmental Defense Fund v. Adams*, 434 F. Supp. 403,
25  406 (D.D.C. 1977).  Second, the "proposal must have well-enough defined geographic,

26
27  ─────────────
28  [4]  The alternatives considered in any detail were the proposed action; two alternatives in the same
    general area with the same technology but different configurations (*i.e*, the Mitigated Ivanpah 3
    Alternative and the Modified I-15 Alternative); and the No Action Alternative.  SSF 71.  In other
    words, it was utility-scale development or no action.  There was nothing in between.

1   temporal and subject matter limits so that the official can meaningfully address the
2   questions posed in 42 U.S.C. § 4332(2)(C)."   *Id.*   The Ninth Circuit has held that an
3   agency must prepare both a programmatic EIS and a site-specific EIS "[w]here there are
4   large scale plans for regional development" and "several foreseeable similar projects in
5   a geographical region have a cumulative impact."   *City of Tenakee Springs v. Clough*,
6   915 F.3d 1308, 1312 (9th Cir. 1990).

7        In the case at hand, there were several similar solar-electricity projects on CDCA
8   land that will have cumulative impacts and were being considered during the same time
9   period.  Early in the process, Federal Defendants were alerted to the concern that there
10  were a number of existing applications for like projects having the potential to have
11  direct, indirect, and cumulative impacts to CDCA lands and that a programmatic EIS was
12  required to comply with NEPA.  SSF 76.  As time went on, the need for a programmatic
13  EIS became more apparent as BLM began defining a discrete set of projects within the
14  CDCA that were to be reviewed on the same time-table.  SSF 77 (timeline status of
15  California fast-track projects).

16       Apart from an examination of all of the solar-electricity generating projects within
17  the CDCA going through the "fast track" program, the industrialization of the Ivanpah
18  Valley should have been considered in a single environmental document. The Center for
19  Biological Diversity put BLM on notice that the failure to consider connected,
20  cumulative, and similar actions in the same environmental document amounts to
21  unlawful segmentation. SSF 78.  Substantial industrialization is immediately apparent
22  from a comparison of maps showing the Ivanpah Valley before and after the Ivanpah
23  Project and the other proposed projects.  SSF 79.  Together these projects together have
24  significant cumulative impacts.  The EIS acknowledges that if a number of foreseeable
25  cumulative projects are developed, the Ivanpah Valley landscape would "quickly reach
26  a visual quality and sensitivity condition, becoming an urbanized environment, in
27  apparent conflict with the area's Multiple-Use Class L status under the CDCA Plan and
28  the County of San Bernardino's scenic highway policies."  SSF 80.  Overall, the change

in land-use intensity from the Class L designation that much of the CDCA has to a more industrialized area should have triggered a more comprehensive EIS.

Altogether, the Court should set aside Federal Defendants' unlawful segmentation of the Ivanpah Project from its temporal/geographic counterparts and order an EIS that covers connected actions: either the entire "fast track" program for solar-electricity generation projects within the CDCA, the Ivanpah Project and the other proposed projects that industrialize the Ivanpah Valley, or both.  Anything less would violate NEPA, *Kleppe*, and *City of Tenakee Springs*.

## C.      Defendants Violated the Federal Land Policy and Management Act

FLPMA establishes requirements for land-use planning on public land.  Congress declared that it is federal policy to manage the public lands "in a manner that will protect the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values."   43 U.S.C. § 1701(a)(8). FLPMA requires Federal Defendants to "take any action necessary to prevent unnecessary or undue degradation of land." 43 U.S.C. § 1732(b). FLPMA requires BLM to "develop, maintain, and when appropriate, revise land use plans" to ensure that land management is conducted "on the basis of multiple use and sustained yield."  43 U.S.C. § 1701(a)(7) & 1712(a).  "Once a land use plan is developed, '[a]ll future resource management authorizations and actions . . . shall conform to the approved plan." *Oregon Natural Resources Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007).  Under the CDCA Plan, Federal Defendants are required "to provide for the immediate and future protection and administration of the public lands in the California desert within the framework of a program of multiple use and sustained yield, and the maintenance of the environmental quality."  43 U.S.C. § 1781(b).

Federal Defendants adopted the CDCA Plan Amendment to facilitate this large-scale industrial solar facility--the largest of its kind on public land--on Class L (Limited) public lands even though millions of acres of Class I (Intensive) lands are available for industrial development.  SSF 81 (noting that Project will be entirely on Multiple Use

Class L land).  Class L public lands are to be "managed to provide for generally lower-intensity, carefully controlled multiple use of resources while ensuring that sensitive values are not significantly diminished."  SSF 82.  For Class L public lands, consumptive uses are allowed "***only up to the point*** that sensitive natural and cultural values might be degraded."  SSF 83 (emphasis added).

The Ivanpah Project would result in direct adverse impacts to existing scenic-resource values as seen from several Key Observation Points in the Ivanpah Valley and Clark Mountains, including viewpoints in the Stateline Wilderness Area, in the Mojave National Preserve, throughout the east face of Clark Mountain, from middle-ground-distance viewpoints on Interstate 15, and from the Primm Valley Golf Course.  SSF 84. "The visual impacts associated with the project would be viewed by visitors to the Mojave National Preserve and two designated wilderness areas, and a land-sailing site of regional or greater importance.  The potential effects involve the unique scenic characteristics of the local landscape as indicated by the national park and wilderness designations of portions of the project viewshed. . . ."  *Id*.  Glare from the project "could alter the character of views of Clark Mountain from the valley floor, affecting the public's ability to enjoy those views, though not preventing them."  *Id*.  The EIS acknowledges that if a number of foreseeable cumulative projects are developed, the Ivanpah Valley landscape would "quickly reach a visual quality and sensitivity condition, becoming an urbanized environment, in apparent conflict with the area's Multiple-Use Class L status under the CDCA Plan and the County of San Bernardino's scenic highway policies."  *Id*.  The Ivanpah Project contributes to that urbanized environment to a degree that is wholly inconsistent with the Class L designation.

The Project degrades the environment in many other ways.  For example, the Project's construction activities will contribute to $PM_{10}$ and ozone impacts.  SSF 85.  The Project will have direct, adverse impacts to desert tortoise habitat.  SSF 86.  In addition to direct habitat loss, the Project will also fragment and degrade adjacent tortoise habitat. *Id*.  The Project has potential impacts to soil and water resources.  SSF 87.  Project-

1    related changes to alluvial fan hydrology could result in impacts to adjacent land users

2    and the Ivanpah playa.  *Id.*

3        The Project also diminishes cultural values of the site.   The CDCA Plan

4    recognizes

> Prominent features of the CDCA landscape, wildlife species, prehistoric and historic sites of occupation, worship, and domestic activities, and many plant and mineral resources are of traditional cultural value in the lives of the Desert's Native people.  In some cases these resources have a religious value. Specific sites or regions may be important because of their role in ritual or the mythic origin of an ethnic group.  These values will be considered in all CDCA land-use and management decisions.

10   SSF 88.  While these values are to be considered in all CDCA land-use decisions, these

11   values were ignored here.  For example, while the relocation of desert tortoises was

12   considered from a biological standpoint, relocation was not considered from the

13   standpoint of sacred areas used for religious practices.  Meanwhile, the relocation of

14   desert tortoises negatively impacts Native Americans' religious practices.  SSF 13.

15       Accordingly,  approval  of  the  CDCA  Plan  Amendment  to  place  this  major

16   industrial use on Class L land was arbitrary, capricious, and not in accordance with

17   FLPMA.

18       **D.**    **Defendants Violated the National Historic Preservation Act**

19       Regulations promulgated to implement Section 106 of the NHPA--*e.g.*, 36 C.F.R.

20   §  800.1(a),  §  800.2(a)(4)  &  (d)(1)--require  federal  agencies  to  provide  interested

21   members of the public with a reasonable opportunity to participate in decision-making

22   processes.  NHPA regulations also state that the "views of the public are essential to

23   informed Federal decisionmaking in the section 106 process.  The agency official shall

24   seek  and  consider  the  views  of  the  public  in  a  manner  that  reflects  the  nature  and

25   complexity of the undertaking and its effects on historic properties, the likely interest of

26   the  public  in  the  effects  on  historic  properties,  confidentiality  concerns  of  private

27   individuals  and  businesses,  and  the  relationship  of  the  Federal  involvement  to  the

28   undertaking."  36 C.F.R. § 800.1(d)(1).  "The agency official must . . . provide the public

with information about an undertaking and its effects on historic properties and seek public comment and input." *Id.*, § 800.1(d)(2). The agency must "plan for involving the public in the section 106 process." *Id.*, § 800.3(e). The agency has an obligation to seek information from "consulting parties, and other individuals and organizations likely to have knowledge of, or concern with, historic properties in the area, and identify issues relating to the undertaking's potential effects on historic properties." *Id.*, § 800.4(a)(3).

Plaintiffs should have been consulted. For example, Plaintiff Phillip Smith contacted BLM to express concern over the Ivanpah Project and other solar projects in the area. SSF 89. He specifically commented that "the Chemehuevi used to live in and use the mountains surrounding the Ivanpah Valley for hunting and collecting, that a spring was named 'Ivanpah' meaning 'good water' in Chemehuevi (not near the project area) and that he wanted to be included on future mailings." SSF 90. In February 2010, Mr. Smith attended an open house regarding the Project at BLM's Needles office and identified himself as being there for the Colorado River Indian Tribe. SSF 91. Despite Mr. Smith's many attempts to participate and his obvious relevant knowledge and concerns, there is no evidence that Federal Defendants ever contacted him to consult about his knowledge of the area and inquire into potential cultural or religious impacts of the Project.

By failing to seek and consider input from the public on historical sites, consult with knowledgeable people or have any apparent plan to include the public in the consultation process, Federal Defendants violated the consultation requirements of the NHPA.

## E.   Defendants Violated the Religious Freedom Restoration Act

Federal Defendants have violated RFRA. The purpose of RFRA is to prevent the federal government from substantially burdening the free exercise of religion. 42 U.S.C. § 2000bb(b)(2). To prevail on a RFRA claim, Plaintiffs must demonstrate two elements. *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008). First, Plaintiffs must demonstrate that the activities burdened by the government action are an "exercise

of religion." *Id.* Second, the government action must "substantially burden" Plaintiffs' exercise of religion. *Id.* Once those elements are demonstrated, the burden shifts to the government to prove that the challenged action is in furtherance of a "compelling government interest" and is implemented by "the least restrictive means to achieve its purpose, unless the plaintiff first proves the government action substantially burdens his exercise of religion." *Id.* at 1069.

Plaintiffs do not anticipate that there will be a dispute that the exercise of their religion requires use of the land because there has not been a dispute as of yet. Federal Defendants generally recognize that Native Americans use the land for religious purposes. For example, the CDCA Plan states:

> Prominent features of the CDCA landscape, wildlife species, prehistoric and ***historic sites of occupation, worship, and domestic activities***, and many plant and mineral resources are of traditional cultural value in the lives of the Desert's Native people. In some cases these resources have a religious value. ***Specific sites or regions may be important because of their role in ritual or the mythic origin of an ethnic group***. These values will be considered in all CDCA land-use and management decisions.

SSF 89 (emphasis added). In any event, a few of the Plaintiffs have submitted declarations describing some of the religious rituals that take place at the site. SSF 8-9, 25-28 & 34-36.

A "substantial burden" is imposed where (1) "individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit," or (2) "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation, supra*, 553 F.3d at 1070. The Supreme Court considered RFRA in a case where a "religious sect in the Amazon Rainforest receives communion by drinking a sacramental tea, brewed from plants unique to that region, that contains a hallucinogen regulated under the Controlled Substances Act by the Federal Government." *Gonzalez v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 423 (2006). In that case, the religion required the sacramental tea and the burden was the threat of a criminal sentence for possession. *Id.* at 425. In the case at hand, the

religious practice requires access to certain land and the burden involves the threat of criminal trespass charges. No case holds or even suggests that the threat of criminal prosecution for possession of a controlled substance necessary for a religious practice is different from the threat of criminal prosecution for trespassing on property necessary for a religious practice. Each threat qualifies under RFRA.

Plaintiffs anticipate a contention that they cannot establish a *prima facie* case under RFRA due to the precedent of *Navajo Nation, supra*, and *Snoqualmie Indian Tribe v. Federal Energy Regulatory Commission*, 545 F.3d 1207 (9th Cir. 2008) ("*Snoqualmie*"). Plaintiffs acknowledge that *Navajo Nation* and *Snoqualmie* appear controlling at a glance, but there are crucial factual distinctions that render them inapplicable. In particular, the lack of access to the site and the risk of prosecution differentiate this case from those.

In *Navajo Nation*, the district court found that there would be no resources with religious significance or religious ceremonies that would be physically affected and that the "Plaintiffs continue to have virtually unlimited access to the mountain, including the ski area, for religious and cultural purposes." *Navajo Nation, supra*, 535 F.3d at 1063. The federal agency's Memorandum of Agreement, among other things, continued to allow the tribes access to the mountain for cultural and religious reasons. *Id*. at 1066. Determining that there was no substantial burden, the Ninth Circuit emphasized that the federal agency guaranteed that religious practitioners would still have access for religious purposes. *Id*. at 1070. Altogether, in *Navajo Nation* there was no evidence of loss of access and, consequently, no allegation that religious practitioners were forced to decide between practicing their religion and civil or criminal sanctions for trespass. That evidence exists here. *See* SSF 19, 32 & 39.

Similarly, in *Snoqualmie*, although it was alleged that operation of the dam would deprive the tribe of access, the Ninth Circuit noted that the federal action did not "prohibit or prevent the Snoqualmies' access to Snoqualmie Falls, their possession and use of religious objects, or the performance or religious ceremonies." *Id.*, 545 F.3d at

1215.  There is no mention of trespass or other sanction in that case, and it appears that there was ultimately a lack of evidence of deprivation of access.  Plaintiffs' loss of access is real, as is the threat of arrest for trespass.  *See* SSF 19, 32 & 39.

In addition, Plaintiffs are undeniably being deprived of the benefit of access to public land.  To be sure, the CDCA Plan specifically recognizes the importance of Native American values and separates them from consideration of other cultural resources.  SSF 92.  The Native American Element of the CDCA Plan recognizes various laws aimed at protecting traditional Native American values, including the American Indian Religious Freedom Act of 1978 and Task Force Report on P.L. 95-341, which recognized the special social and religious values which many natural and cultural resources hold for traditional Native Americans.   SSF 93.   The Native American Element further determines (with Plaintiffs' emphasis) that "the *rights guaranteed* to Native people under existing legislation *include access to sites*, use and possession of sacred objects, and the freedom to worship through ceremonies and traditional rites."  *Id.*  Plaintiffs are being denied the rights that the CDCA Plan confirms they have because they are being denied access to sites and the freedom to worship through ceremonies and traditional rights.  SSF 19, 32 & 39.  The location of the Ivanpah Project in an area that recognizes the importance of Native American access for religious purposes through a plan pursuant to Congressional mandate also differentiates this case from *Navajo Nation* and *Snoqualmie*.

Plaintiffs also anticipate the contention that the benefit of access to public land is not the type of governmental benefit that RFRA contemplates.  However, Plaintiffs have found no case suggesting that is true.  In fact, the deprivation of a governmental benefit is not even necessarily a benefit derived by statute.  For example, in considering a RFRA claim by Rastafarian and Muslim inmates, whose religious beliefs forbid them from cutting their hair or shaving their beards, a district court found a substantial burden imposed by a grooming policy requiring short hair and shaving.  *Gartrell v. Ashcroft*, 191 F. Supp. 2d 23, 26 (D.D.C. 2002).  Among the consequences for failing to comply

with the grooming policy, the court noted, were the "loss of privileges such as visitation, commissary, and telephone." *Id*. If the loss of privileges in a prison amount to denial of a government benefit under RFRA, then the loss of access to public land is the denial of a governmental benefit--especially where the policies governing the area recognize the importance of the land for Native American religious purposes like those that Plaintiffs can no longer pursue at the site of the Ivanpah Project.

Federal Defendants violated RFRA not only by denying Plaintiffs access to the Ivanpah Project site and forcing them to choose between practicing their religion or facing criminal trespass charges, but also by depriving them of the benefit of access to federal public land where the importance of the land has long been recognized by the federal government for Native American use in religious practices.

## F.   <u>Defendants Violated the Energy Policy Act of 2005</u>

Plaintiffs' concern over the loan guarantee issued for the Ivanpah Project stems from the awarding of loan guarantees under Section 1705 of EPAct without any regulatory criteria to ensure that the guarantees will achieve the legislative goals of EPAct and ARRA. The APA "ensures that the massive federal bureaucracy remains tethered to those it governs." *Riverbend Farms v. Madigan*, 958 F.2d 1479, 1483-1484 (9th Cir. 1992). The "principal purpose" of the APA is "to provide that legislative functions of administrative agencies shall as far as possible be exercised only upon public participation." *San Diego Air Sports Ctr. v. Federal Aviation Admin.*, 887 F. 2d 966, 969 (9th Cir. 1989) (referring to APA Section 553; citing S. Doc. No. 248, 79th Cong., 2d Sess. 257 (1946)). However, DOE has been awarding guarantees (including for the Ivanpah Project) without rhyme or reason, effectively propping up renewable-energy projects that are not financially viable and that will not protect or create jobs, will not promote economic recovery (and will actually burden the federal purse), will not spur scientific or health advances, will not protect the environment (and in fact will delay reductions in greenhouse gas emissions), and will do nothing to help state and local governments with their finances. On the whole and across the board, the projects that

received Section 1705 loan guarantees will do more harm than good.  There is no reason for the public to endure such insult and injury.

On two occasions since 2005, Congress has tasked DOE with issuing loan guarantees for worthy renewable-energy projects under EPAct's Title XVII.  The first occurred in 2005, when Congress created what is known as the Section 1703 program (for innovative technologies that reduce greenhouse gases). 42 U.S.C. § 16513. Eligible projects included those that "(1) avoid, reduce, or sequester air pollutants or anthropogenic emissions of greenhouse gases; and (2) employ new or significantly improved technologies as compared to commercial technologies in service in the United States at the time the guarantee is issued." *Id.*

The second occurred in 2009, when Congress created what is known as the Section 1705 program (for renewable-energy systems, electricity-transmission systems, and leading-edge biofuel projects) as part of the ARRA.  Congress passed the ARRA in February 2009 as a response to the nation's economic difficulties.  The ARRA's stated purpose was to "preserve and create jobs and promote economic recovery," "assist those most impacted by the recession," "provide investments needed to increase economic efficiency by spurring technological advances in science and health," "invest in transportation, *environmental protection*, and other infrastructure that will provide long-term economic benefits," and "stabilize State and local governmental budgets."  Pub. L. No. 111-5, 123 Stat. 115, § 3(a) (emphasis added).  At the same time, the ARRA ordered the Executive Branch to "manage and expend the funds made available in this Act so as to achieve the purposes specified . . . including commencing expenditures and activities as quickly as possible *consistent with prudent management*." *Id.*, § 3(b) (emphasis added).

ARRA added Section 1705 to EPAct's Title XVII, authorizing DOE to award loan guarantees for projects falling into any of three categories (mentioned in the preceding paragraph) provided that construction began by September 30, 2011.  42

U.S.C. § 16516(a)(1)-(3).  This was the same date on which DOE's authority to award loan guarantees was set to expire.  *Id.*, § 16516(e).

While Congress wanted DOE to implement Section 1705 as quickly as possible, that mandate was twice circumscribed.  Congress actually directed DOE to award Section 1705 loan guarantees (and spend other monies made available under ARRA) "as quickly as possible ***consistent with prudent management***."  Pub. L. No. 111-5, 123 Stat. 115, § 3(b) (2009) (emphasis added).  Even before then, between 2005 and 2009, Congress realized that loan guarantees would expose the federal taxpayer to a multi-billion-dollar financial risk and therefore enacted a statutory prohibition against the awarding of any loan guarantee under Title XVII until DOE issued final regulations for vetting potential loan-guarantee recipients.  In other words, the prohibition was put in place after the Section 1703 program was created but before the Section 1705 program was created.  In particular, Public Law 110-5 added Section 16515 to Title 42 of the United States Code.  This statute prohibited the awarding of any loan guarantee

> under Title XVII . . . ***until final regulations are issued*** that include--(1) programmatic, technical, and financial factors the Secretary will use to select projects for loan guarantees; (2) policies and procedures for selecting and monitoring lenders and loan performance; and (3) any other policies, procedures, or information necessary to implement title XVII of [EPAct].

*Id.*, § 16515(b) (emphasis added).  So important were these "final regulations for loan guarantees" that Congress ordered the Energy Secretary to promulgate them within six months of the statute's enactment.  *Id.*, § 16515(d).

Against this legislative backdrop, in May 2007 DOE issued a Notice of Proposed Rulemaking and Opportunity for Comment for the addition of part 609 (§§ 609.1 to 609.18) to Title 10 of the Code of Federal Regulations.  The proposed regulations were intended to address loan guarantees for "Eligible Projects," defined to mean new and innovative technology that was not a commercial technology and otherwise met the requirements of Section 1703. *See* 72 Fed. Reg. 27471, 27480 (May 16, 2007); SSF 94. By October 2007, DOE published notice of its final rule for "Loan Guarantees That

Employ Innovative Technologies," which would be codified at 10 C.F.R. part 609. *See generally* 72 Fed. Reg. 60116 (Oct. 23, 2007); SSF 95.  The notice for the final rule indicated that "DOE believes that commercial use of these technologies will help sustain and promote economic growth, produce a more stable and secure energy supply and economy for the United States, and improve the environment." *Id.* (col. 1).  In December 2009, DOE made changes "to the regulations for the loan guarantee program authorized by Section 1703 of Title XVII of the Energy Policy Act of 2005."  74 F.R. 63544 (December 4, 2009); SSF 96.

The substance of Section 1705 is twice significant.  On the one hand, having been enacted in February 2009, Section 1705 gave DOE and loan-guarantee recipients more than 2.5 *years* to issue final regulations, award guarantees, and break ground on (*i.e.*, start, not finish) the projects.  On the other hand, Section 1705 was inserted into Title XVII of EPAct, did not supplant any provision of Title XVII, and in fact was not exempted from any of the other requirements of Title XVII.  Apart from the addition of Section 1705, DOE had to take Title XVII as it found it--including the "final regulations" prerequisite to the issuance of loan guarantees.

There is no dispute that DOE did not issue final regulations for Section 1705 loan guarantees before issuing the Ivanpah Project loan guarantee.  *See* SSF 97 (Federal Defendants' Answer admitting allegation that "[n]o regulations have been promulgated for loan guarantees issued under Section 1705 of the EPAct").  Issuing a loan guarantee under Section 1705 for the Project violated the requirements that no loan guarantee under Title XVII be issued until final regulations meeting the prescribed criteria were issued.  42 U.S.C. § 16515(b).   Actions in excess of statutory jurisdiction, authority, or limitations are violations of the APA.  5 U.S.C. § 706(2)(C).

There is also no dispute that DOE did not publish a notice of proposed rule-making in the Federal Register for the intent to rely on the regulations codified in part 609 of title 10 of the Code of Federal Regulations for Section 1705 loan guarantees.  SSF 98.  Prior to promulgating a new regulation or substantially modifying a new regulation,

a federal agency must publish notice of proposed rule-making in the Federal Register unless the rule is merely interpretive, a general statement of policy or a rule of agency organization, procedure or practice; or the agency, for good cause, finds the notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest. 5 U.S.C. § 553. To the extent that DOE was relying on the regulations for the Section 1703 program for a Section 1705 loan guarantee, the reliance would be a substantial modification to the Part 609 regulations because Part 609 was limited to supporting eligible projects under Section 1703. (§ 609.1 (purpose and scope) & 609.2 (definition of eligible project). Substantially modifying a regulation without a notice and comment period violates the APA. 5 U.S.C. § 706(2)(A) & (D).

Having failed to issue final regulations for the Section 1705 loan guarantees, Federal Defendants (namely, Treasury- and DOE-affiliated Defendants) violated EPAct and the ARRA. The Ivanpah Project's loan guarantee is therefore invalid.

## V. CONCLUSION

For all of these reasons, Plaintiffs respectfully request that the Court enter summary judgment in their favor on the claims discussed above.

Date: April 13, 2012.          Respectfully submitted,

                               BRIGGS LAW CORPORATION

                       By:     s/ Cory J. Briggs

                               Attorneys for Plaintiffs La Cuna de Aztlan Sacred Sites Protection Circle Advisory Committee, CAlifornians for Renewable Energy, Alfredo Acosta Figueroa, Phillip Smith, Patricia Figueroa, Ronald Van Fleet, and Catherine Ohrin-Greipp