BRIGGS LAW CORPORATION [FILE: 1190.05]
Cory J. Briggs (State Bar no. 176284)
Mekaela M. Gladden (State Bar no. 253673)
99 East "C" Street, Suite 111
Upland, CA 91786
Telephone: 909-949-7115
Facsimile: 909-949-7121

Attorneys for Plaintiffs La Cuna de Aztlan Sacred Sites Protection Circle Advisory Committee, CAlifornians for Renewable Energy, Alfredo Acosta Figueroa, Phillip Smith, Patricia Figueroa, Ronald Van Fleet, Catherine Ohrin-Greipp. Rudy Martinez Macias, and Gilbert Leivas

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA CUNA DE AZTLAN SACRED SITES PROTECTION CIRCLE ADVISORY COMMITTEE *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR *et al.*,<br><br>　　　　Defendants. | CASE NO.2:11-CV-00400-DMG-DTB<br><br>**PLAINTIFFS' OPPOSITION BRIEF TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:　August 31, 2012<br>Hearing Time:　9:30 a.m.<br>Courtroom:　7<br>Judge:　Hon. Dolly M. Gee |

　　　　Plaintiffs respectfully submit this opposition brief against Federal Defendants' cross-motion for summary judgment and reply brief in support of Plaintiffs' own motion for summary judgment.

**Table of Contents**

I. Introduction .................................................... 1

II. Argument and Analysis ........................................... 1

    A. Defendants Violated the National Environmental Policy Act ........ 1

        1. Defendants Defined the Ivanpah Project's Purpose and Need Too Narrowly ........................................ 1

        2. Defendants Did Not Prepare a Programmatic Environmental Impact Statement .................................... 3

    B. Defendants Violated the Federal Land Policy and Management Act ................................................................. 5

    C. Defendants Violated the National Historic Preservation Act ......... 7

    D. Defendants Violated the Religious Freedom Restoration Act ........ 8

    E. Defendants Violated the Energy Policy Act of 2005 ............. 10

        1. Plaintiffs Have Standing to Assert this Claim .............. 10

        2. The Loan Guarantee Should Not Have Been Issued Because No Regulations Were Issued for the Section 1705 Program ..................................... 12

III. Conclusion .................................................. 13

# Table of Authorities

### Judicial Authorities

*Building & Construction Trades Department v. Martin,* 961 F.2d 269 (1992) .... 12

*City of Tenakee Springs v. Clogh*, 915 F.3d 1308 (9th Cir. 1990) ............... 5

*Douglas Timber Operations v. Salazar*, 774 F.Supp.2d 245 (D.D.C. 2011) ...... 11

*Gonzalez v. O Centro Espirita Beneficente Uniao Do Vegetal*,
   546 U.S. 418 (2006) .................................................... 9

*Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) .......................... 5

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................... 11

*Navajo Nation v. U.S. Forest Serv*, 535 F.3d 1058 (9th Cir. 2008) ........... 8, 9

*Oregon Natural Resources Council Fund v. Brong*,
   492 F.3d 1120 (9th Cir. 2007) .......................................... 5

*Snoqualmie Indian Tribe v. Federal Energy Regulatory Commission*,
   545 F.3d 1207 (9th Cir. 2008) .......................................... 8

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009). ................... 11

### Legislative Authorities

42 U.S.C. § 16515 ................................................. 10, 12, 13

42 U.S.C. § 2000BB ....................................................... 8

Pub. L. No. 111-5, 123 Stat. 115 ......................................... 10

### Administrative Authorities

36 C.F.R. § 800.4 ......................................................... 7

36 C.F.R. § 800.16 ........................................................ 7

40 C.F.R. § 1502.14 ....................................................... 2

40 C.F.R. § 1506.1 ........................................................ 4

## I. INTRODUCTION

Plaintiffs have moved for summary judgment under the Administrative Procedure Act ("APA), the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act ("FLPMA"), the National Historic Preservation Act ("NHPA"), the Religious Freedom Restoration Act ("RFRA"), and the Energy Policy Act of 2005. For each of Plaintiffs' claims, Federal Defendants assert that Plaintiffs have not met their burden. Accordingly, Federal Defendants assert that they are entitled to summary judgment on all issues. However, as explained in Plaintiffs' moving papers and further below, Plaintiffs have met their burden and the Court should grant Plaintiffs' motion for summary judgment and deny Federal Defendants' motion for summary judgment.

## II. ARGUMENT AND ANALYSIS

With the exception of the Energy Policy Act of 2005 claim, Federal Defendants do not assert that Plaintiffs lack standing to maintain this action. Therefore, with the single exception, Plaintiffs will not address the issue further. All other issues will be addressed in turn.

**A.  Defendants Violated the National Environmental Policy Act**

**1.  Defendants Defined the Ivanpah Project's Purpose and Need Too Narrowly**

The statement of purpose and need for the Ivanpah Project is too narrow. Federal Defendants assert three arguments in opposition. First, they assert that the Court already considered and rejected the argument in a preliminary injunction order in a different case, to which Plaintiffs are not parties. However, the Court's decision on a preliminary injunction in another case does not pre-ordain the ruling on Plaintiffs' claim with the benefit of a record.

Second, Federal Defendants assert that the reference within the purpose and need section to authorities identified elsewhere in the FEIS amount to a public purpose and need. The FEIS does not say that the purpose and need is based on these other policies

even though it acknowledges the authorities. If BLM intended those policies to describe the purpose and need for its actions, then they would have been identified in the Record of Decision as well. However, the purpose and need portion of the Record of Decision does not mention the other policies. Instead, the Record of Decision states:

> The BLM's purpose and need for the ISEGS project is to respond to the BrightSource applications (via Solar Partners) under Title V of the Federal Land Policy and Management Act . . . for ROW grants to construct, maintain, and terminate a solar concentrated solar electric generation plant on public land along with the associated infrastructure in compliance with FLPMA, BLM ROW regulations, and other applicable federal laws. The CDCA Plan is specifically amended to read by this ROD to allow a solar energy generation facility on this site.

ISEGS0000091. The alternatives identified in detail are also consistent with an application-focused purpose and need. The four "alternatives" included the proposed project, the required no-project alternative (40 C.F.R. § 1502.14(d)), and two alternatives that were similar to the proposed project in location and technology but with different configurations. ISEGS 00001569-70 (explaining that Mitigated Ivanpah 3 Alternative would be in same location as proposed project, consist of three solar concentrating thermal power plants, which are comprised of fields of heliostats, but would configure the project boundaries differently than the proposed project) & 1579-80 (explaining that Modified I-15 Alternative would be in the same location as the proposed project, consist of three solar concentrating thermal power plants, which are comprised of fields of heliostats, but would adjust the project footprint and result in less acreage). If the purpose and need for the project were to account for more than just the applicant's application, one would expect the alternatives considered in detail to consist of more than the required no-project alternative and three Project variations.

   Finally, Federal Defendants argue that Plaintiffs are asking the Court to make a policy decision to elevate distributed energy above utility-scale generation. Actually, Plaintiffs are not asking the Court to make any such policy call. Plaintiffs' point is simply that the agencies' myopic view of their role in reviewing the Project did not allow

for the development of alternatives, which would have enabled the agencies to make an informed policy call when deciding what the outcome should be.

By having an unreasonably narrow statement of purpose and need, Federal Defendants violated NEPA in that regard and necessarily failed to look at a reasonable range of alternatives.[1] NEPA and the Ninth Circuit condone neither.

### 2. **Defendants Did Not Prepare a Programmatic Environmental Impact Statement**

Federal Defendants violated NEPA in another way. They did so by failing to prepare a programmatic EIS for the other solar-electricity projects taking place in the CDCA around the same time.

In opposition, Federal Defendants assert that the various solar projects contemplated for development in the CDCA are each distinct and independent and not readily susceptible to treatment in a single EIS.[2] However, Federal Defendants insist that this action is necessary to work towards the Energy Policy Act of 2005's goal of 10,000 megawatts of renewable energy on public land. To do that, they put together a priority list of fast-track projects. See SSF 77 (timeline status of California fast-track projects). That is the proposal. It is similar geographically, insofar as the projects are all within the CDCA Plan area; temporally, insofar as they were all being coordinated at the same time; and substantively, insofar as they have the same subject matter. Admittedly, the scope of the program is entitled to some discretion, but the problem is that the Federal Defendants did *nothing* of a programmatic nature *before* approving the Project. Had Federal Defendants conducted the Solar Energy Development PEIS before approval of this Project, then Plaintiffs would have no claim now. The problem is that these utility-

---

[1] The alternatives considered in any detail were the proposed action; two alternatives in the same general area with the same technology but different configurations (*i.e*, the Mitigated Ivanpah 3 Alternative and the Modified I-15 Alternative); and the No Action Alternative. SSF 71. In other words, it was utility-scale development or no action. There was nothing in between.

[2] Never mind that Federal Defendants are currently preparing a PEIS for solar projects on public land. Opp'n Br., p. 8, lns. 17-20.

PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT ETC.
Page 3

scale solar energy projects were all being proposed at the same time, in the same area, as part of the same renewable-energy program. Indeed, it is hard to imagine a more paradigmatic case for programmatic environmental review. By segmenting the individual projects, the impacts of transforming the CDCA Plan area into a patchwork of solar fields were completely overlooked.

Next, Federal Defendants argue that even if a PEIS were required, BLM could proceed with the Ivanpah Project in the meantime under Section 1506.1(c)(2) of Title 40 of the Code of Federal Regulations. While work on a PEIS is in progress, agencies are not to undertake any major Federal action covered by the program unless the action (1) is justified indepenently of the program; (2) is accompanied by an adequate environmental impact statement; and (3) will not prejudice the ultimate decision on the program by tending to determine subsequent development or limiting alternatives. 40 C.F.R. § 1506.1(c). As demonstrated in the preceding section, Plaintiffs contend that the EIS is inadequate. Furthermore, the approval of this Project does tend to determine subsequent development and limit alternatives. There is only so much space available on any given distribution line, and the approval of a major project like this one necessarily limits what other projects make sense and where they can be located. What good does it do if the PEIS determines that another location is better suited for solar energy development of this intensity on public land when this Project and others like it are already up and running? What good are the mitigation measures identified in the PEIS when looking at the bigger picture when they will not be required for projects that were approved before it was finalized? By approving this Project ahead of the PEIS, the planning process is stuck with projects that were fast-tracked when there may have been a better alternative.

Altogether, the Court should set aside Federal Defendants' unlawful segmentation of the Ivanpah Project from its temporal/geographic counterparts and order a programmatic EIS that covers connected actions: either the entire "fast track" program for solar-electricity generation projects within the CDCA, the Ivanpah Project and the

other proposed projects that industrialize the Ivanpah Valley, or both. Anything less would violate NEPA, *Kleppe*, and *City of Tenakee Springs*.[3]

### B. Defendants Violated the Federal Land Policy and Management Act

The Federal Defendants assert that FLPMA has not been violated because the CDCA Plan allows for solar projects on Class L lands if NEPA requirements are met and because NEPA is merely a procedural statute. Opp'n Br., p. 13, lns.8-19. As addressed above, NEPA requirements have not been met. Fundamentally, however, this is a problem with intensity, not the type of use.

"Once a land use plan is developed, '[a]ll future resource management authorizations and actions . . . shall conform to the approved plan.'" *Oregon Natural Resources Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007). Class L public lands are to be "managed to provide for generally ***lower-intensity***, carefully controlled multiple use of resources ***while ensuring that sensitive values are not significantly diminished***." SSF 82 (emphasis added). For Class L public lands, consumptive uses are allowed "***only up to the point*** that sensitive natural and cultural values might be degraded." SSF 83 (emphasis added). The CDCA Plan reaffirms that "Class L would ***protect sensitive natural, scenic, ecological, and cultural resources***, while providing for ***low-intensity*** multiple use that could be carefully controlled." BLM Supp. AR 124 (emphasis added). By contrast, Class M is based on a balance of "higher intensity use and protection of public lands" and "provides for a wide variety of present and future uses." BLM Supp. AR 16.

This is ***not*** a case in which Class L lands were re-classified as Class M lands (after an adequate review of the environmental consequences of such a change). This is a case in which the Federal Defendants are trying to force a square peg into a round hole. In

---

[3] It would be sufficient if the Ivanpah Project were covered by the pending programmatic EIS as long as the Project were subject to all the findings, mitigation measures, and other requirements of that document and record of decision. Delay is not Plaintiffs' goal, and taking advantage of an existing review process would be acceptable. All Plaintiffs care about is ***fully informed*** decision-making.

particular, Class L lands are being used for a large-scale industrial solar facility that, under the existing land-classification scheme, is not authorized. The Ivanpah Project will result in adverse impacts, beyond what is allowed on Class L lands. In particular, "sensitive natural, scenic, ecological and cultural resources" will be harmed because of the intensity of this Project. Thousands of acres of habitat for wildlife and vegetation will be impacted and the adverse impacts cannot be avoided, including desert tortoises. ISEGS00001384 (FEIS). Before the Project, very little of the Ivanpah Valley was developed. *Id*. The Ivanpah Project impacts more than 3,500 acres of land and on its own will represent nearly 20% of the cumulative development destruction anticipated in the area. *Id*. This impact will not be avoided or reduced through mitigation. *Id*. The Ivanpah Project contributes to that urbanized environment to a degree that is wholly inconsistent with the Class L designation.

The Project also diminishes cultural values of the site. The CDCA Plan recognizes

> Prominent features of the CDCA landscape, wildlife species, prehistoric and historic sites of occupation, worship, and domestic activities, and many plant and mineral resources are of traditional cultural value in the lives of the Desert's Native people. In some cases these resources have a religious value. Specific sites or regions may be important because of their role in ritual or the mythic origin of an ethnic group. These values will be considered in all CDCA land-use and management decisions.

SSF 88. While these values are to be considered in all CDCA land-use decisions, these values were ignored here. For example, while the relocation of desert tortoises was considered from a biological standpoint, relocation was not considered from the standpoint of sacred areas used for religious practices. Meanwhile, the relocation of desert tortoises negatively impacts Native Americans' religious practices. SSF 13.

Accordingly, approval of the CDCA Plan Amendment to place this major industrial use on Class L land was arbitrary, capricious, and not in accordance with FLPMA.

## C. **Defendants Violated the National Historic Preservation Act**

Federal Defendants assert that the NHPA only requires government-to-government consultation and because Plaintiffs have not demonstrated that they can bring this suit on behalf of a tribe, there is no NHPA claim to be had. Apart from the ***government***-consultation requirement, however, the agency must "[s]eek information, as appropriate, from consulting parties, ***and other individuals and organizations*** likely to have knowledge of, or concerns with, historic properties in the area, and identifying issues relating to the undertaking's potential effects on historical properties." 36 C.F.R. § 800.4(a)(3). "Historic property" includes "artifacts, records and remains" and "includes properties of traditional religious and cultural importance to an Indian tribe." *Id*. at § 800.16(l)(1). In other words, BLM was at the very least required to seek information from individuals and organizations with knowledge of historic resources, and not just those that are considered consulting parties as a matter of course or by being granted permission.

Phillip Smith contacted BLM to express concern over the Ivanpah Project and other solar projects in the area. SSF 89. He specifically commented that "the Chemehuevi used to live in and use the mountains surrounding the Ivanpah Valley for hunting and collecting, that a spring was named 'Ivanpah' meaning 'good water' in Chemehuevi (not near the project area) and that he wanted to be included on future mailings." SSF 90. In February 2010, Mr. Smith attended an open house regarding the Project at BLM's Needles office and identified himself as being there for the Colorado River Indian Tribe. SSF 91. Despite Mr. Smith's many attempts to participate and his obvious relevant knowledge and concerns, there is no evidence that Federal Defendants ever contacted him to consult about his knowledge of the area and inquire into potential cultural or religious impacts of the Project.

By failing to seek and consider input from the public on historical sites, consult with knowledgeable people or have any apparent plan to include the public in the

consultation process, Federal Defendants violated the consultation requirements of the NHPA.

### D. **Defendants Violated the Religious Freedom Restoration Act**

Federal Defendants have violated RFRA. The purpose of RFRA is to prevent the federal government from substantially burdening the free exercise of religion. 42 U.S.C. § 2000bb(b)(2). To prevail on a RFRA claim, Plaintiffs must prove two elements. *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008). First, they must demonstrate that the activities burdened by the government action are an "exercise of religion." *Id*. Second, the government action must "substantially burden" Plaintiffs' exercise of religion. *Id.* Once those elements are demonstrated, the burden shifts to the government to prove that the challenged action is in furtherance of a "compelling government interest" and is implemented by "the least restrictive means to achieve its purpose, unless the plaintiff first proves the government action substantially burdens his exercise of religion." *Id.* at 1069.

Without any legal authority, Federal Defendants assert that if "denial of access is insufficient to raise a RFRA claim, it does not matter how access might be denied in a particular instances [*sic*]." Opp'n Br., p. 17, lns. 2-4. The problem with the assertion is that it fails to identify the point at which a denial of access does trigger a RFRA claim. In *Navajo Nation*, the district court found that there would be no resources with religious significance or religious ceremonies that would be physically affected and that the "Plaintiffs continue to have ***virtually unlimited access*** to the mountain, including the ski area, for religious and cultural purposes." *Navajo Nation, supra*, 535 F.3d at 1063 (emphasis added). The federal agency's Memorandum of Agreement, among other things, ***continued to allow the tribes access*** to the mountain for cultural and religious reasons. *Id*. at 1066. Determining that there was no substantial burden, the Ninth Circuit emphasized that the federal agency guaranteed that religious practitioners would ***still have access*** for religious purposes. *Id*. at 1070. Similarly, in *Snoqualmie*, although it was alleged that operation of the dam would deprive the tribe of access, the Ninth Circuit

noted that the record showed that the federal action did ***not*** "prohibit or prevent the Snoqualmies' access to Snoqualmie Falls, their possession and use of religious objects, or the performance or religious ceremonies." *Id.*, 545 F.3d at 1215.  Thus, denial of access may very well give rise to a RFRA claim.  This case is drastically different because there is no dispute about Plaintiffs' denial of access for religious purposes.  *Cf.* Pls.' SSF 39 (docket 109-2); Fed. Defs' Response to SSF, ¶ 39 (docket 114-2).[4]

In any event, "how" access is denied matters because of the test for a "substantial burden."  A "substantial burden" is imposed where (1) "individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit," or (2) "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions."  *Navajo Nation, supra*, 553 F.3d at 1070.  The Supreme Court considered RFRA in a case where a "religious sect in the Amazon Rainforest receives communion by drinking a sacramental tea, brewed from plants unique to that region, that contains a hallucinogen regulated under the Controlled Substances Act by the Federal Government."  *Gonzalez v. O Centro Espirita Beneficiente Uniao Do Vegetal*, 546 U.S. 418, 423 (2006).  In that case, the religion required the sacramental tea and the burden was the threat of a criminal sentence for possession.  *Id*. at 425.  Federal Defendants assert that this case does not add anything to the discussion because there the government conceded that the plaintiff had presented a prima facie RFRA case that threatened prosecution under the Controlled Substances Act burdened its religious practice of drinking a sacramental tea containing a banned hallucinogen.  Opp'n Br., p. 17, n. 14.  The assertion gets Federal Defendants nowhere fast.  On the one hand, they have not denied that Plaintiffs' religious freedom is being put at risk.  *Cf.* Pls.' SSF 39 (docket 109-2); Fed. Defs' Response to SSF, ¶ 39 (docket 114-2).  On the other hand, it is entirely beside Plaintiffs' point that threatened prosecution for trespassing on land needed for a religious ceremony is no different than threatened prosecution for using a

---

[4] Nor have the BrightSource Defendants offered any evidence to dispute Plaintiffs' claim.

banned substance during a religious ceremony.  In both cases, religious practitioners must make a choice between practicing their religion and being criminally punished--a choice that the U.S. Constitution and federal law do not require them to make.

Federal Defendants violated RFRA not only by denying Plaintiffs access to the Ivanpah Project site and forcing them to choose between practicing their religion or facing criminal trespass charges, but also by depriving them of the benefit of access to federal public land where the importance of the land has long been recognized by the federal government for Native American use in religious practices.

### E. **Defendants Violated the Energy Policy Act of 2005**

Plaintiffs' concern over the loan guarantee issued for the Ivanpah Project stems from the awarding of loan guarantees under Section 1705 of EPAct without any regulatory criteria to ensure that the guarantees will achieve the legislative goals of EPAct and ARRA.  Public Law 110-5 added Section 16515 to Title 42 of the United States Code.  This statute prohibited the awarding of any loan guarantee

> under Title XVII . . . ***until final regulations are issued*** that include--(1) programmatic, technical, and financial factors the Secretary will use to select projects for loan guarantees; (2) policies and procedures for selecting and monitoring lenders and loan performance; and (3) any other policies, procedures, or information necessary to implement Title XVII of [EPAct].

*Id.*, § 16515(b) (emphasis added).  No regulations were issued for the Section 1705 program, under which the Ivanpah Project was awarded a loan guarantee.

#### 1. **Plaintiffs Have Standing to Assert this Claim**

Federal Defendants' first argument is that Plaintiffs have failed to demonstrate standing to the maintain their claim under the Energy Policy Act of 2005.

First, Federal Defendants assert that Plaintiff must show that the Ivanpah Project would not be constructed without the DOE loan guarantees and that the guarantees would not have been provided for the Ivanpah Project if regulations had been implemented.  On the first point, one need look no further than the BrightSource Defendants' declaration about the need for the loan guarantees to be viable. Pls.' Opp'n

Ex. "A" (declaration explaining that if any element of financing, including the loan guarantee, was not obtained the Project would not likely be viable). On the second point, the standard for procedural injuries, such as not having the opportunity to comment, is not that the comments *would* have made a difference. The causation requirement for procedural injuries, when compared to constitutional injuries, is relaxed. *Douglas Timber Operators v. Salazar*, 774 F. Supp. 2d 245, 255 (D.D.C. 2011) (citing *Lujan, supra*, 504 U.S. at 572 n. 7, and *Summers v. Earth Island Institute*, 555 U.S. 488 (2009)). The lack of an opportunity to comment on an administrative decision that, if provided, *could have* "'reduce[d] the probability' of injury" is enough to establish standing for a procedural injury when concrete interests are affected. *Id.*

Second, Federal Defendants assert that Plaintiffs are not within the zone of interests. In supporting their argument, Federal Defendants claim that the Section 1705 program was not about environmental protection. However, DOE's purpose and need statement indicates that the "two principal goals of the loan guarantee program are to encourage commercial use in the United States of new or significantly improved energy-related technologies and to achieve substantial environmental benefits" and DOE's purpose and need is to select "eligible projects that meet the goals of the Act." ISEGS00001528. The zone-of-interests assertion is simply belied by the Federal Defendants' own documents.

Finally, Federal Defendants argue that even if the Court were to consider the broader environmental interests of the Energy Policy Act of 2005 as a whole, Section 1705 was exempt from the original criteria for environmental benefits and the Act does not contemplate local environmental effects. Federal Defendants insist that Plaintiffs are mistaken in their interpretation that all of Title XVII was intended to achieve substantial environmental benefits because DOE made the statement with respect to implementing Section 1703. Opp'n Br., p. 23, n. 21. As just explained, however, Federal Defendants made the same statement when considering whether to provide a loan guarantee for the Ivanpah Project. Federal Defendants do not explain why litigation to vindicate the aims

of environmental protection would frustrate achieving a substantial environmental benefit just because it might potentially frustrate the balancing goal of improving energy-related technologies. Plaintiffs contend that the Ivanpah Project is environmentally harmful, and thus Plaintiffs do fall within the zone of interests of promoting environmental benefits.

### 2. **The Loan Guarantee Should Not Have Been Issued Because No Regulations Were Issued for the Section 1705 Program**

Federal Defendants argue that regulations were not required before issuing loan guarantees under the Section 1705 program. Their first point is that the regulation requirement was part of an appropriations bill, substantive law cannot be changed by an appropriations bill, and changes made in an appropriations bill are only intended for the applicable fiscal year. However, as one of the cases they cited indicates, the general rules regarding appropriation bills being applicable only in the fiscal year enacted do not apply when a provision indicates that it is intended to be permanent. *Building & Construction Trades Department v. Martin*, 961 F.2d 269, 274 (1992). Section 16515 was explicitly intended to apply beyond the fiscal year in which it was enacted. Indeed, Section 16515 requires annual reports *after* the first year of the program. 42 U.S.C. § 16515(e). This language would make no sense--it would be mere surplusage--if it were not intended to apply in subsequent years.

Next, Federal Defendants argue that reliance on Section 1703 regulations was a policy decision. This is irrelevant, even if true, because Plaintiffs' point is that regulations were *required by Congress* before loan guarantees could be issued. The Part 609 regulations were expressly limited to supporting eligible projects under Section 1703. 10 C.F.R. §§ 609.1 (purpose and scope) & 609.2 (definition of eligible project). To the extent that Federal Defendants were relying on the Section 1703 regulations to fulfill the requirement to have regulations in place before issuing loan guarantees for the Section 1705 program, that would be an amendment to the rule. Amending a rule is "rule

making" under the APA, and Federal Defendants did not follow the process to do so. 5 U.S.C. § 551(5).

Finally, Federal Defendants argue that loan guarantee regulations would be exempt from notice-and-comment rulemaking. Notice-and-comment rulemaking or not, Federal Defendants do not dispute that no regulations were issued for the Section 1705 program. Loan guarantees could not be issued under Title XVII of the Energy Policy Act of 2005 until final regulations were issued to implement the program. *See* 42 U.S.C. § 16515(b). Regulations were issued for part of the Title XVII program, but not the part authorizing the loan guarantee for the Ivanpah Project. Even if Federal Defendants were correct that notice-and-comment rulemaking was not required, being excused from those procedures did not exempt Federal Defendants from issuing any regulations.

Altogether, Federal Defendants improperly issued loan guarantees, including the loan guarantee for the Ivanpah Project, without issuing regulations.

## III. CONCLUSION

For all these reasons, as well as those in Plaintiffs' moving papers, Plaintiffs respectfully request that the Court enter summary judgment in their favor and against Federal Defendants on the claims discussed above.

Date: July 20, 2012.　　　　　Respectfully submitted,

　　　　　　　　　　　　　　BRIGGS LAW CORPORATION

　　　　　　　　　　　　By:　  s/ Cory J. Briggs  

　　　　　　　　　　　　　　Attorneys for Plaintiffs La Cuna de Aztlan Sacred Sites Protection Circle Advisory Committee, CAlifornians for Renewable Energy, Alfredo Acosta Figueroa, Phillip Smith, Patricia Figueroa, Ronald Van Fleet, and Catherine Ohrin-Greipp